Good morning, Your Honors. May it please the Court. Under the unique facts of this case, the warrantless detention of Mr. Hardy violated the Fourth Amendment because there was no objectively reasonable or articulable suspicion to believe that he was involved with any criminal activity on the morning of November 8, 2017. And I think our biggest point here is that reasonable suspicion for a Terry stop requires a particularized and objective basis for suspecting the particular person stopped of criminal activity. And here, if we're looking at the events historically that led up to the seizure and we look at those events through an objective lens, there's reasonable suspicion is lacking. Ultimately, what we have here is Mr. Hardy was walking on a sidewalk 0.3 miles away from a residence where a 9-1-1 caller reported hearing a person in her front yard. Seven minutes later, or maybe 11 or 12 minutes later, it's not really late. Between 11 and 14 minutes after the 9-1-1 call. Was it 1.30 in the morning more or less? Right, the 9-1-1 call was at 1.21 a.m. But when he was spotted, it was 1.30 some odd. And wearing all black in a high crime neighborhood. That's correct. Only person around. Yes, Your Honor. Not an articulable basis for suspicion. I see Your Honor's point, but I believe that these recitations about the high crime neighborhood and property crime. Those are just generalized assertions. Nothing about that is particular to Mr. Hardy. Other than the actual proximity of where he was in relation to the 9-1-1 caller's residence. But in determining reasonable suspicion, this court must evaluate the totality of the circumstances. Including those facts objectively indicating that Mr. Hardy was not involved with any criminal activity. Let me put it to you this way. In the case that you rely on a good bit, Hurd. To me, the argument there was Mr. Hurd is walking a dog in a situation where it would be plausible, very plausible. That there would be lots of other people in similar circumstances. Here, this could be a completely innocent explanation. But the number of people plausibly who would be in the same situation, area, close in time, late at night. Even past the high crime area. Is much smaller. So, a reasonable person would be more suspicious that a facially innocent activity would not be innocent. If there's unlikely to be many other innocent people in the same way. I mean, that's kind of simple logic, isn't it? That's correct, Your Honor. And I understand Your Honor's point. But it's not a crime to walk at night. No, it's not a crime. But the policeman doesn't have to know there's a crime. He's got to have a reasonable suspicion of it. Right? I mean, somebody could have broken down. You know, I was once walking at 3 in the morning in an area because I was going to watch a lunar eclipse. Now, that's a pretty crazy thing. But it can happen. You know, a policeman stopped me. I would have said, why are you out here at 3 in the morning? I said, I'm going to see the lunar eclipse. He looked up in the sky and said, okay, on your way, kid. That's true, Your Honor. Here the explanation wasn't nearly as good, was it? That's true, Your Honor. But again, we're back to the fact there's no reason to believe that Mr. Hardy in particular was connected to this 911 call. Although he was the only person in particular in that neighborhood. Well, again, Your Honor, I think in evaluating the totality of the circumstances, we have to look at actually what we know about this 911 call. The substance of the 911 call is itself a fact we must consider in assessing the totality of the circumstance. And because this 911 call is so devoid of any useful or reliable information that would allow us to determine what crime had been committed and by whom, all we really know is that this caller hears somebody outside her home. She did not see anything, did not provide a description of what she heard. There's absolutely no description of what caused the noise. This information was relayed to Officer Howell, and he understood this to mean that the resident heard what she thought was someone. And it could very well have been an animal or a vehicle or a person of any race, height, gender, or body type. And even when he went out there, he didn't see any crimes or any persons in front of the residence. So effectively, what we have here is when the officer sees Mr. Hardy, the officer has absolutely no particular and individualized basis to believe that Mr. Hardy was the person the 911 caller heard in her front yard. The fact that he's 0.3 miles away, that's also true of every other person and vehicle and animal that's within 0.3 miles of this man. None of whom, as far as we can tell, are out at this time of night. Well, Your Honor, the officer stated he was not investigating and did not keep track of how many vehicles he saw. So there could have been, in a residential neighborhood, you would expect plenty of vehicles in the area which could have accounted for this. At 1.30 in the morning? On a Wednesday? Yes, Your Honor. But the 911 caller didn't say she heard a vehicle. She heard, she said she hears somebody outside her home, but the information was relayed to Officer Howell, and he understood this to mean she heard a noise she thought was somebody. And he candidly acknowledged that. But I was talking about your vehicle. She didn't say she heard a vehicle. She said she heard something she thought was somebody. Your Honor, the officer testified that he had no knowledge of whether the person who may or may not have been there might have been driving a vehicle, and that might have been what she heard. That's page 20 of the suppression transcript. Okay. So I think we need to look also at the facts that were in the record that would show that Mr. Hardy was not involved in criminal activity because that's relevant into assessing the court's totality of the circumstances inquiry. So when Officer Howell stopped Mr. Hardy, he was simply walking on the sidewalk at night. Officer Howell testified himself that as far as he could tell, Mr. Hardy was not breaking any laws, and he's allowed to walk freely on the sidewalk. He was 0.3 miles away from the residence. There were no clues as to who or what made the noise the caller heard and that she assumed was somebody in her yard. The officer testified and acknowledged that there was zero physical descriptors that would have allowed him to conclude that Mr. Hardy was associated with the West Wilding 911 call. It was just wrong place, wrong time. There were no bulges in Mr. Hardy's waistband or pockets or any other indication that he was concealing weapons or contraband. When Officer Howell approached Mr. Hardy, it was initially a consensual encounter, so Mr. Hardy simply could have walked away. He did not flee or try to avoid the officer, as in other cases where this court and the Supreme Court have found reasonable suspicion. In fact, he stopped walking. He answered questions. He cooperated with the officer's line of questioning. He told the officer where he was coming from and where he was going. He did not try to hide his identity. No, he didn't tell him. Specifically, as I understand it, they didn't say, was it Sings Market, was it this other market? But he did give an explanation that was a bit fishy. That is, he could have said, if he'd said, I'm coming from Sings Market, that would have helped him. If the officer had asked, what's the name of the market, might have helped the officer, depending on how fishy his answer was to that. Your Honor, the officer did not make any attempt to clarify this point. Officer Howell testified that he asked Mr. Hardy where he was going, and Mr. Hardy responds that he went to the store to buy a cigarillo, and he was walking back to his mom's house. And I will point out that based on the body camera, he in fact has a cigarillo in his hand. And the officer found it totally implausible that he would be walking to Sings Market, which is 1.5 miles away. But, I mean, surely none of us think 1.5 miles is an impossible voyage for a young, fit man. And then additionally, the officer asked Mr. Howell, are you armed? And Mr. Hardy, the testimony established, says no. And then Officer Howell asked Mr. Hardy something else, which prompts Mr. Hardy to respond, and he can provide his ID number. So, I mean, my point that I'm getting to here is that these are direct responses to direct questions. The fact that Officer Howell had a hunch that Mr. Hardy was lying does not mean that an objectively reasonable officer would have looked at these questions and answers and determined that Mr. Hardy was engaged in criminal activity. A hunch that Mr. Hardy is lying is not the same as reasonable suspicion to believe he's engaged with any sort of criminal activity. And again, because this is, even if his responses are evasive, at this point in the questioning, it's a consensual encounter with the police. So, Mr. Hardy is perfectly at liberty to answer evasively or even to refuse to answer at all. But the officer is perfectly entitled to infer from those articulable circumstances, including a refusal to answer at all, reasonable suspicion when added to other circumstances. That's correct, Your Honor. But in determining whether the officer acted reasonably, weight is not to be given to the officer's inchoate and unparticularized suspicion or hunches. And my point here is that, yes, we agree this officer subjectively believed that Mr. Hardy... I see my time has expired. Oh, not quite. My apologies. If you insist. I do not insist. So, I mean, my point, we agree that this officer subjectively believed Mr. Hardy was up to something. But that's not the standard. The standard is whether an objectively reasonable officer looking at these facts and looking at Mr. Hardy's behavior would have reasonable suspicion to believe that Mr. Hardy was engaged in criminal activity. And there's absolutely nothing to suggest that Mr. Hardy was engaged in criminal activity. And with respect to the proximity to the 911 call, a couple of points. I think the temporal and physical link is quite weak here. 0.3 miles is nearly four and a half football fields in length. That is a substantial distance in a residential neighborhood where there would be dozens of other houses and vehicles within a 0.3 mile radius of this residence. And Mr. Hardy was 0.3 miles away between 11 and 14 minutes after the 911 call. And frankly, I'm indeterminate. But let me ask you something. Would it be reasonable, let me put it this way. It's not your position that no reasonable officer would believe that there might be somebody in the neighborhood after hearing the information from the 911 call.  I would, Your Honor. Okay. So if we start from that premise and we have his testimony that he drove around the neighborhood and the only person he saw in the entire neighborhood was Mr. Hardy, why is it not reasonable? Your Honor, there's no particular and objective basis to believe that Mr. Hardy was the individual the 911 caller heard in her yard. But if there's nobody else and he's driven around the whole neighborhood and he only sees one person and it's within 11 to 14 minutes of the call and he is located within a seven minute walk of the residence that made the call and we agree that it's reasonable for the officer to believe that somebody might have been making that noise. Why is it your position, and I guess it has to be, that no reasonable officer could conclude that maybe there was reasonable suspicion that he was the one who made the noise? Your Honor, now my time really has expired. May I attempt to answer? Sure. Your Honor, I think really it's just that that's not enough. Just the mere proximity without more considering how that's the only evidence in the record. And again, our position is not that some individual or person might not have been making this noise. It's that there's nothing to indicate that it was Mr. Hardy specifically. It's not particular and objective. Okay. Thank you, counsel. Mr. Ross, we've covered a lot. What can you add for us? May it please the court. Jonathan Ross on behalf of the United States. Not a lot, Your Honor. The district court correctly found that there was reasonable suspicion for the officer to both stop the defendant and to physically pat down the defendant. As for the first question, reasonable suspicion to stop, as the court has noted, this is a 911 call, 121 in the morning, in a high-crime neighborhood. The caller reports having heard somebody outside of her house. That's what she says, and that's the information that is communicated to the officer. I believe the officer said that when he went to the neighborhood, he was on a call of, I think it was a Code 20, I believe, a prowler. So he wasn't looking for an animal. He wasn't looking for some other explanation for the noise. He was there looking for someone outside of the house. Goes to the house. He doesn't see anyone. Drops around the block. Doesn't see anybody. Doesn't see a soul out there until he comes across Mr. Hardy. That is the particularized suspicion, that Mr. Hardy is the only particular person walking around in the Spring Valley neighborhood that evening. Mr. Hardy's dressed in black. The officer knew that black clothing was consistent with the type of attire that someone about to commit a property crime might wear. The caller's call that someone's outside my house, the officer knew that that could indicate that the person outside of the house was casing for a robbery. Therefore, the officer, reasonably given that it was only 11 minutes after the caller had come in, linked Mr. Hardy to the call and linked the call to a potential property crime or, at minimum, a trespass. But there's more. The stop did not begin at that point. The encounter that ensued between the officer and Mr. Hardy initially was a consensual encounter. The officer asked Mr. Hardy what he was doing. Mr. Hardy said, I'm walking back from the store now to Judge Boggs. Your question a moment ago that the officer didn't ask more questions at that point. Sure, he could have. He could have tested. Well, let me ask you this since we're getting into that. I found this case kind of interesting because, you know, most of the time the magistrate judge, the district judge are on the same page. Here the magistrate judge, who I guess is now a district judge, comes out the other way. And the recitations of the facts are a little different in the two opinions. And I focus on, first, the part about the cigarillo. The magistrate judge notes that it helps his story that he went to the store to get cigarillos. He's got one in his hand. Secondly is the district judge doesn't say this, but the magistrate judge does. He asks him, is he armed? And he says no, according to the magistrate judge. According to the district judge, he says, don't shoot me, which is much more suspicious. But what's the facts? What does the record seem to show? Does it show that he first said no, I'm not armed, or did he immediately go to don't shoot me? Your Honor, in putting together the body cam video, which was at evidence during the suppression hearing, along with the testimony of Officer Howell, the facts, well, you have to consider both because there's no audio for the first, I believe, minute or so of the body cam video. So you see the officer and Mr. Hardy engaging, but you don't know what's being said. And so during the suppression hearing, the officer testified that he asked Mr. Hardy what he was doing, where he was going, where he was coming from. And he asked Mr. Hardy during that silent portion of the video whether or not Mr. Hardy was armed. And Mr. Hardy initially said, according to the officer, no, and that the officer asked the question. So the magistrate judge was being correct in what he says. Yes, Your Honor, but the district court was not incorrect. The district court just skipped a little bit of the encounter. So Mr. Hardy said no. The officer asked a second time. At that point, the magistrate judge found, and there was testimony in the suppression hearing to support, that after that, Mr. Hardy became evasive in his responses to the question, are you armed? Now, there was no testimony in the district court as to how exactly he was evasive, what Mr. Hardy said. But the officer said he was evasive, and the magistrate judge found that as a finding of fact. At that point, the officer said, stand still. And I think the parties are in agreement that it was at the moment that Officer Howell said stand still that the Terry stop began. And the officer then said, I'm going to pat you down. And after that, Mr. Hardy said, don't shoot me. Now, the district court correctly noted that the don't shoot me statements, because they came after the officer's instruction to stand still, could not be considered in the analysis as to whether there was reasonable suspicion for the stop. However, the don't shoot me statements came before the officer actually conducted the pat down. Therefore, the don't shoot me statements, and the government argued in its brief, are properly considered in the analysis as to whether or not there was reasonable suspicion to think that Mr. Hardy was armed and dangerous. I thought that argument to the contrary of you on that had been abandoned. I thought that Mr. Hardy's counsel was only attacking the articulable facts for the stop, not for the seizure. Am I wrong about that? We'll ask her, but that's what I inferred from the briefs. Go ahead and address that. If she wants to say, look at page so-and-so, we'll look at page so-and-so. Yes, Your Honor. All of the factors that played into the reasonable suspicion stop analysis also supported the reasonable suspicion to pat down, coupled with the fact that the defendant was wearing loose clothing. Loose clothing can be used to conceal weapons. Also, the defendant's statement, don't shoot me, as well as the defendant's keeping his hands in close proximity to his pockets, and, in fact, rapidly reaching into the pocket at one point during an encounter and pulling out a phone. Certainly, once the defendant took his hand out of the pocket and it was just a phone, that mitigated that factor. But it still showed that the defendant had pockets, was able to conceal things on his person, and was, in fact, able to rapidly reach in the pockets and pull something out. So those factors, along with the factors to support the stop, did support the frisk. And, again, to your question, Judge Boggs, a moment ago, the issue of should the officer have asked more questions to test the story about which market were you going to, certainly he could have, but Terry does not require that an officer conduct an extensive investigation before commencing a stop, given that the officer, it's 1.30 in the morning, high crime neighborhood, and the officer is by himself, and both is developing reasonable suspicion to think that Mr. Hardy has either committed a crime or is about to, and that Mr. Hardy might be armed and dangerous. The officer acted reasonably in short-circuiting further investigation, and instead acting to protect himself and Mr. Hardy by immediately going to a stop and a pat-down. And there's nothing in this court's law that would require more from the officer in this case. Based on the totality of the circumstances, the officer acted reasonably in conducting the stop and in conducting the pat-down. If there are no further questions, I'll yield back the balance of my time. Thank you, counsel. Counsel on two minutes. Thank you, Your Honor. I just have a couple quick brief points. First, the don't shoot me statements, I think everyone in the district court agreed, occurred after the crucial moment for purposes of the Terry stop, and therefore they should not factor into the reasonable suspicion analysis. And then this might be quibbling, but I don't think the magistrate judge found that Mr. Hardy was in fact being evasive with his responses. I believe the magistrate judge found that the officer considered his statements to be evasive. But again, we actually know what the questions and answers were based on the officer's testimony. And so the officer's subjective belief that our client was lying just simply should not enter into whether there's reasonable and particularized suspicion to believe that Mr. Hardy was in fact involved with or about to be involved with some form of criminal activity. And then this point about this being a high-crime neighborhood. Mere presence in a high-crime neighborhood is not enough. The Supreme Court specifically told us so in Illinois v. Wardlow. And frankly, to hold otherwise and to give such great weight to it in this case would mean that anyone who lives in a high-crime neighborhood is not afforded the same protections as someone whose socioeconomic status would permit them to live in an affluent or otherwise low-crime environment. But even if it were a low-crime environment, you know, if you get a call at 1.30 in the morning on a weeknight that somebody has heard something in their front yard or whatever, and they've heard it the last two nights as well, and the officer, and we've already agreed that it's not unreasonable for the officer to believe that there might actually be a person responsible for that. And you're driving around the neighborhood, and you look and you look and you look, and there's only one person, whether it's a high-crime neighborhood or not, why isn't it reasonable for the officer to have some kind of reasonable suspicion that that might be the person who created the noise? Your Honor, I don't think that amounts to reasonable suspicion. There has to be reasonable suspicion. I understand, but why? Because this particular person, there's nothing connecting this person, whether they're walking or not.  If you believe that a person did it, right, and we've already established that it's not unreasonable for an officer to do that, why is it unreasonable if there's only one person in the area, regardless of whether it's high-crime or not, to believe that that's the person who might be responsible for making the noise? Your Honor, that ties the entirety of the reasonable suspicion analysis to the physical and temporal link between these two events. That doesn't take into account the totality of the circumstances and all of the other evidence which indicates that Mr. Hardy was not connected to this and was not engaged in any type of criminal activity. Thank you. Thank you, counsel. We'll take that case under submission. The third case.